IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| WALTER THOMAS, | ) | CASE NO. 1:15-CV-02071 |
| | ) | |
| Plaintiff, | ) | JUDGE CHRISTOPHER A. BOYKO |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL SECURITY, | ) | THOMAS M. PARKER |
| | ) | |
| Defendant. | ) | |
| | ) | **REPORT & RECOMMENDATION** |

I.      **Introduction**

Plaintiff, Walter Thomas ("Thomas"), seeks judicial review of the final decision of the Commissioner of Social Security denying his application for Supplemental Security Income ("SSI") benefits under Title XVI of the Social Security Act ("Act").  (Doc. 1)   This matter is before the court pursuant to 42 U.S.C. §1383(c)(3), 42 U.S.C. §405(g), and Local Rule 72.2(b).

For the reasons set forth below, it is recommended that the final decision of the Commissioner be AFFIRMED.

II.      **Procedural History**

A.      **2007 Application**

Thomas applied for SSI on December 27, 2007, alleging a disability onset date of November 1, 2006.  (Tr. 60-61; 132-34)  Thomas's application was denied initially on May 21, 2008 (Tr. 46) and after reconsideration on October 1, 2008.  (Tr. 53)  On October 27, 2008, Mr. Thomas requested an administrative hearing.  (Tr. 64)

Thomas' first hearing took place before Administrative Law Judge (ALJ) Troy M. Patterson on June 14, 2010.  (Tr. 25-40)  On August 25, 2010, the ALJ issued a decision finding

that Thomas was not disabled.  (Tr. 7-24)  The Appeals Council denied review, rendering the

ALJ's August 25, 2010 decision final (Tr. 1-6).   Thomas appealed that decision to this Court

(Case No. 1:12-cv-0780).[1]

###    B.    2012 Application

While the appeal on his first application was pending in federal court, on August 13,

2012, Thomas filed another application for SSI and also an application for Disability Insurance

Benefits (DIB).  (Tr. 1657-72)[2]  Thomas alleged a disability onset date of August 26, 2010.  (Tr.

1657, 1667)  Thomas did not meet the income requirements of DIB and, thus, his DIB

application was denied on October 6, 2012.  (Tr. 1582-84)  Thomas' SSI claim was denied

initially on October 31, 2012 (Tr. 1603) and after reconsideration on February 6, 2013.  (Tr.

1592)  On March 26, 2013, Thomas requested an administrative hearing.  (Tr. 1598)

A hearing took place on his second application before Administrative Law Judge (ALJ)

Frederick Andreas on May 20, 2014.  (Tr. 1392-1462)  On January 26, 2015, ALJ Andreas

issued a decision finding that Thomas was not disabled.  (Tr. 1368-90)  The Appeals Council

denied review, rendering the ALJ's January 26, 2015, decision final. (Tr. 1362-67)

On October 7, 2015, Thomas filed an appeal of the ALJ's final decision with this court.

(Doc. 1)  Defendant answered and filed the transcript of the administrative proceedings on

January 13, 2016. (Docs. 9 and 10)  Thomas then filed his brief on the merits on March 29, 2016

---

[1] On September 24, 2013, M.J. Baughman issued a Memorandum Opinion and Order remanding that case
to "more fully develop an analysis regarding medical opinions in line with *Gayheart v. Commissioner of
Social Security* [710 F.3d 365 (6th Cir. 2013)."  1:12cv00780; ECF Doc. No. 28, Page ID# 1496.
Plaintiff had argued, in that appeal, that the ALJ improperly disregarded the 2009 medical opinion by his
treating psychiatrist, Dr. Abraham.  This case involves a similar argument; however, it involves a new
hearing and decision by a second ALJ.  Further evidence has been submitted and considered in the current
appeal.

[2] According to the Commissioner, The Appeals counsel vacated the original ALJ decision and
consolidated plaintiff's claims in the current matter.  ECF Doc. No. 15, Page ID# 2210.

(Doc. 13) and Defendant filed its brief on the merits on May 31, 2016 (Doc. 15), making the

matter ripe for this court's review.

## III.     Evidence

### A.      Personal, Educational and Vocational Evidence

Thomas was born on August 24, 1961. (Tr. 1657)  He has a limited education. (Tr. 1658)

Thomas was incarcerated from the 1980s into the early 2000s and was concluded to have no past

relevant work experience. (Tr. 186, 213, 1379)

### B.      Medical Evidence

The medical records related to Plaintiff's arguments and Defendant's responses are

summarized below.[3]

The records reflect that Thomas received treatment from the Nord Center for various

mental impairments beginning in July 2008.[4]  (Tr. 1270-1342, 1743-1895, 1988-99, 2019-41,

2092-99)  He was initially diagnosed with Major Depressive Disorder severe, with psychotic

features and Panic disorder, without Agoraphobia and Bereavement.  (Tr. 1342).  He was

prescribed Celexa (aka citalopram) (Tr. 1341) and later Doxepine to aid with his sleep (Tr. 1331)

from psychiatric nurse Danielson.  In November 2008, Thomas stated that although he found the

Celexa and Doxepine helpful, he did not fill one of his previous prescriptions and was taking

Xanax he obtained from a friend.  (Tr. 1325)  He stated that he was hearing voices and believed

people were laughing at him.  (Id.)  Nurse Danielson prescribed Seroquel and recommended he

restart the Celexa.  (Id.)  She also counseled him on PTSD as a result of his prison experience.

---

[3] Thomas only challenges the Commissioner's decision with respect to his mental health impairments.  As
such, only evidence related to those impairments is summarized herein.

[4] The medical treatment notes also indicated that Thomas was previously treated for his mental health
while in prison.  (Tr. 1341)

(Id.)    At a subsequent visit, Thomas reported feeling better since his previous appointment but stated that the Seroquel made him feel too sedated.   (Tr. 1322)  Nurse Danielson consulted with psychiatrist, Dr. Praveen Abraham, who recommended Seroquel be replaced with Risperdal. (Tr. 1322)  In March 2009, Thomas was again off of his prescribed medications and Dr. Abraham instructed him to stop taking illicit Xanax.  (Tr. 1314)  Dr. Abraham noted that Thomas was stable but symptomatic.  (Id.)  Thomas was told that taking the illicit Xanax could possibly increase his systems further.  (Tr. 1314)  Dr. Abraham prescribed Xanax and Symbyax.  (Tr. 1314)  In May 2009, Dr. Abraham reported that Thomas' symptoms were improving but increased his dosage for both medications.  (Tr. 1306)  In July 2009, Dr. Abraham again reported Thomas' symptoms were improving (including almost a complete reduction in hearing voices) but increased the Xanax to twice daily upon Thomas' request.  (Tr. 1299)  In September 2009, Thomas reported some positive benefits from Xanax although he stated that he was still hearing voices and dealing with anxiety.  (Tr. 1294)  Dr. Abraham added Depakote to Thomas' prescription regime.  (Id.)

Thomas continued to treat at Nord Center through 2014, but no longer with Dr. Abraham. (Tr. 1743-1834, 1988-99, 2019-41, 2092-99)   In July 2010, Thomas stated that he was out of his medication and was no longer engaged in a relationship with his significant other due to conflicts.  (Tr. 1833)  In September 2010, Thomas reported that he had been out of his medication for two months and had been having an increase in psychiatric symptoms.  (Tr. 1832) In November 2010, Thomas was reportedly making some progress with his symptoms.  (Tr. 1826)  In early December 2010, Thomas stated he was medication complaint and had no increase in symptoms.  (Tr. 1825)  At the end of the month, Thomas reported that he ran out of his medication but stated he still had no increase in symptoms at that time.  (Tr. 1818)

4

In January 2011, Thomas reported that he was medication compliant.  (Tr. 1816)  He stated that he runs errands and spends time with friends daily and that he continued to engage in a relationship with a significant other.  (Tr. 1816)  In early February 2011, Thomas reported that he was out of medication for over a month and had a return of symptoms.  (Tr. 1814)  Later that month, Thomas reported that he was very excited about a relationship with a new significant other.  (Tr. 1812)  In July 2011, Thomas stated that he stays at home because he feels that people are looking at him and laughing at him.  (Tr. 1808)  Thomas stated he is medication compliant "at times." (Id.)  He reported that he sees no difference in his behavior whether he is on or off his medications but stated that he takes his medications when his symptoms get bad.  (Id.)  In August 2011, Thomas informed Ms. Smart that he was not getting along with his sister and he stays in the house most days.  (Tr. 1802)  He also stated that each day he plays with his dog, watches TV, and talks to his friends.  (Id.)  He reported that he has two working vehicles and gets out of the state to visit family and friends when he gets a chance, including weekend visits to Tennessee and Alabama the prior month.  (Id.)  In September 2011, Thomas reported that he was medication complaint and having no issues.  (Tr. 1800)  He stated that he goes over two his elderly aunt's house twice a week to take care of her.  (Id.)   In October 2011, Thomas stated he does not like to leave the house.  (Tr. 1798)  In December 2011, Thomas reported that he was feeling depressed and had run out of his medication since the past weekend.  (Tr. 1796)

In January 2012, Thomas stated that he had no symptoms in the past month and that he spent the holidays with family and friends, including a recent trip to Columbus with friends.  (Tr. 1794)  In February 2012, Thomas reported stress due to his brother's passing and stated that he left town for a week to get away from the stress.  (Tr. 1792)  In April 2012, Thomas reported that he was fearful about his own health because his brother passed away from a heart attack, but

stated that he reduced his worrying by keeping himself occupied with friends and family and informed the therapist that he would be "once again" leaving for Columbus for the weekend. (Tr. 1786, 1788)  In May 2012, Thomas reported that a checkup from his doctor resulted in no concerns but that his doctor raised his medication.  (Tr. 1784)  In June 2012, Thomas reported no changes.  (Tr. 1782-83)

The records show that Thomas treated with Maria Smart, MSSA, LSW, at the Nord Center from March 2013 through May 2014.  In March 2013, Thomas reported an increase in depressive symptoms but stated that he was trying to get out of the house more and "went places" with a friend of his.  (Tr. 1760)  In April 2013, Thomas reported positive feedback from attending grief counseling and stated that when he attended the group he did not feel as if others were talking about him because everyone there had similar problems.  (Tr. 1758)  In May 2013, Thomas reported his depression and anxiety were stable.  (Tr. 1756).  He also stated that he thought the six week grief counseling he recently completed was helpful and that he was spending time with friends, his nephews, and going to multiple appointments. (Id.)  The next month, Thomas expressed increased anxiety, reportedly due to the fact that his aunt was very ill and in dealing with the death of his brother.  (Tr. 1754)  In July and August 2013, Thomas reported that he was having trouble sleeping because of the deaths of his aunt and uncle.  (Tr. 1750, 1752).  He stated that he was not taking the Cymbalta that his primary care physician prescribed.  (Tr. 1750)  Thomas stated that he became angry when someone appeared to be mistreating his aunt and has a hard time controlling his anger once he gets frustrated.  (Id.)  He also reported that his anxiety was stable and that he enjoyed socializing with friends recently for a movie marathon.  (Tr. 1752)  In October 2013, Thomas reported anger and sadness because of deaths in his girlfriend's family of people that he was very close with.  (Tr. 1748-49)  He also

reported that he was nervous about his new dog because he believed his neighbor recently poisoned his prior dog with antifreeze. (Tr. 1748). Thomas also reported difficulties with paranoia and sleeping. (Tr. 1746) Thomas reported feeling proud of his nephews and an improved relationship with their father. (Id.) In November and December 2013, Thomas reported that his anxiety stabilized except for a few times in stressful situations, such as: a frustration driving on the Ohio turnpike, a problem processing his medical insurance, and thinking about family members who passed away. (Tr. 1743-44) The therapist noted that Thomas had been keeping his appointments at various places, visiting with family, speaking with guests at a funeral, and making plans with a new friend. (Tr. 1743)

In January 2014, Thomas stated that he recently had an increase in anxiety related to the anniversary of his brother's death. (Tr. 2098) In March 2014, Thomas reported anxiety, particularly due to his time in prison. (Tr. 2095) He reported that he was medication compliant and stated that, while on a date, he experienced anxiety but it was less severe than in the past because he sat in a booth in a corner of the restaurant away from others. (Id.) In May 2014, Thomas reported increased levels of anxiety around holidays and birthdays due to the passing of his mother and brother. (Tr. 2092) Thomas further reported increased stress due to being hit by another driver who did not have insurance. (Id.)

C.    **Opinion Evidence**

1.    **Treating Physician – Dr. Abraham**

On July 27, 2009, Thomas' treating psychiatrist, Dr. Abraham, completed a mental functional capacity assessment. (Tr. 1268-69, 1897) In most areas of functioning, Dr. Abraham opined that Thomas was either moderately or not significantly limited. (Tr. 1268) Dr. Abraham also opined that Thomas was markedly limited in two areas: (1) in his ability to complete a

7

normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistence pace without an unreasonable number length of rest periods and (2) in his ability to travel in unfamiliar places or use public transportation).  (Id.)  He assigned a GAF score of 50 and opined that Thomas would be unemployable.  (Tr. 1269).  Dr. Abraham also noted that Thomas' prior felony conviction prevents employment.  Id.

### 2.    Nord Center Counselors, Maria Smart and Judith Hyde

On April 15, 2013, Maria Smart, MSSA, and Judith Hyde, LPCC-S, from the Nord Center completed an Adult Diagnostic Assessment on Thomas' behalf.  (Tr. 2031-41)  Ms. Smart and Ms. Hyde noted Thomas' self-reports that his mental health symptoms started worsening in December 2012 and he was experiencing problems with depression, anxiety, isolation, and sleep disturbances.  (Tr. 2031, 2038).  Ms. Smart and Ms. Hyde opined that Thomas had moderate symptoms (assigning a GAF score of 60) and moderate difficulty in social or occupational functioning.  (Tr. 2039).

### 3.    Consultative Examiner – Dr. Zeck

On February 1, 2003, Thomas reported to Thomas F. Zeck, Ph.D. for a consultative exam on a prior application.  (Tr. 1162-68)  Dr. Zeck conducted an I.Q. test and Thomas' full scale IQ score put him in the borderline range of intelligence classification.  (Tr. 1166-67)  Dr. Zeck opined that Thomas was either mildly or moderately impaired in all of his work-related mental abilities, except for his ability to withstand the stress and pressures of day-to-day work activity. (Tr. 1167-68)  Dr. Zeck noted that Thomas would have "a difficult time" in this area due to problems with focus, intellectual ability, and emotional problems.  (Id.)

On September 5, 2008, Thomas again reported to Dr. Zeck, for a consultative exam.  (Tr. 1239-1244)  Dr. Zeck opined that Thomas was moderately impaired in his ability to relate to

others; understand, remember, and follow instructions; and to withstand the stress and pressures of day to day work.  (Tr. 1243-44)  He also determined that Thomas was not impaired in his ability to maintain attention, concentration, persistence, and pace to perform simple repetitive tasks.  (Tr. 1244)

On October 18, 2012, Dr. Zeck performed a third consultative examination of Thomas. (Tr. 2108-12).  This time he opined that Thomas would have no problems understanding, remembering, and carrying out instructions.  (Tr. 2112)  He determined that Thomas would have difficulty in his ability to get along with supervisors and co-workers and respond appropriately to work pressures, based on his reported mistrust of others.  (Id.)  Dr. Zeck also noted that Thomas performed poorly on items involving his memory, concentration, and immediate recall, but stated that Thomas was "minimally cooperative and put forth a minimal effort."  (Tr. 2110-12)

### 4.    State Agency Reviewer – Dr. Semmelman

On September 24, 2008, Dr. Patricia Semmelman, Ph.D., state agency reviewer, completed a mental functional capacity assessment for Thomas.  (Tr. 1259-63).  She opined that Thomas exhibited at most moderate limitations in all functional categories.  (Tr. 1259-60)  She determined that Thomas retained the capacity to "interact occasionally and superficially and receive instructions and ask questions appropriately in a smaller or more solitary and less public to nonpublic work setting."  (Tr. 1261)  She also stated that he could "cope with ordinary and routine changes in a work setting that is not fast paced or of high demand." (Id.)

### 5.    State Agency Reviewer – Dr. Lewin

On October 26, 2012, Dr. Caroline Lewin, Ph.D., state agency reviewer, completed a mental residual functional capacity assessment ("MRFC") for Thomas.  (Tr. 1509-11)  Dr. Lewin opined that Thomas was moderately limited in his ability to appropriately respond to changes in

the work setting; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; in his ability to accept instruction and respond appropriately to criticism from supervisors; and his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  (Tr. 1510-11)  Dr. Lewin determined that Thomas was capable of working in an environment where duties remain static and changes can be explained and where he has social interactions on a superficial basis. (Id.)  Dr. Lewin also noted several inconsistencies in Thomas statements in the medical records. (Tr. 1511)

### 6.      State Agency Reviewer – Dr. Umana

Dr. Roseann Umana, Ph.D. state agency reviewer, also completed a MRFC for Thomas dated February 5, 2013.  (Tr. 1515-29)  After a review of the records, Dr. Umana concluded that Thomas retains the residual capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations:  that he is restricted to jobs that involve only superficial interpersonal contact with coworkers and the public, and is limited to simple 1-2 step instructions.  (Tr. 1527)  Dr. Umana considered Dr. Abraham's opinion in her assessment but determined that the opinion was "without substantial support from other evidence in the record." (Tr. 1528)

### D.    Testimonial Evidence

### 1.      Testimony of Plaintiff Walter Thomas

### a.      June 14, 2010 Hearing

A hearing on Thomas' 2007 application was held on June 14, 2010, before Administrative Law Judge Troy M. Patterson.  (Tr. 25)  Thomas stated he was born on August

24, 1961, and resided in Lorain, Ohio.  (Tr. 29)  He stated that he previously worked in a warehouse but only lasted a week because he couldn't focus, get along with others, and made mistakes on the job.  (Tr. 32)  He testified that he also previously worked as a landscaper but could not maintain employment because of pain, nervousness, and not getting along with others. (Tr. 32)  He contended that he does not leave the house and that his Nord Center social worker came to his house for appointments.  (Tr. 33, 36)  He opined that if he had a job his biggest problems would be getting up and getting out the door, being around others, and being in closed areas.  (Tr. 37)

### b.    May 20, 2014 Hearing

A hearing on Thomas' 2012 application was held on May 20, 2014, before Administrative Law Judge Frederick Andreas.  (Tr. 1392-1462)  Thomas testified that the last time he worked was when he came home from prison where he swept floors twice daily at a warehouse.  (Tr. 1402)  Thomas stated that he takes Cymbalta regularly and that his family doctor at times prescribes Xanax when his anxiety increases due to stressful events, such as the deaths of his brother and mother.  (Tr. 1404-1405)

Thomas was examined by his attorney and testified that he lived with his sister who cooked for him, laid out clothes, and otherwise helped care for him.  (Tr. 1407)  He stated his aunt brought him lunch every day and took him to church on Sundays.  (Tr. 1407)  He stated that he sits in the back of the church because he feels people are pointing at him and do not understand his situation.  (Tr. 1408)  He stated church service lasts about two hours and sometimes he has to get up and go outside because he cannot sit for long periods of time.  (Tr. 1409)

Thomas stated that he sees cousins and family members regularly but not friends because

11

they say he is weird. (Tr. 1411)  When questioned about the Nord Center records that stated he

went to a friend's house to watch movies, Thomas stated his counselor advised him to try and go

at least once. (Tr. 1411)  He stated that while he was there he had a panic attack and went

outside. (Tr. 1411)  He talked about a girlfriend he had for four years but stated all of his

relationships end the same – people saying he is weird. (Tr. 1412)

　　　　Thomas testified that he does not drive. (Tr. 1416)  However, the ALJ pointed out that

the records show that he was in a car accident in 2014. (Id.)  Thomas then stated that he drives

sometimes to church or the store. (Tr. 1417-1419)

### 2.　　　Medical Expert's Testimony – Dr. Layton

　　　　Medical expert, Dr. Kent B. Layton, testified at the May 24, 2014, hearing. (Tr. 1421)

Dr. Layton opined that Thomas has affective disorder, major depressive disorder with psychotic

features, adjustment disorder with anxiety and depression when he experiences a loss, panic

disorder NOS and generalized anxiety disorder, substance addition (marijuana and alcohol), anti-

social personality disorder and some narcissistic traits. (Tr. 1430)  Dr. Layton pointed out that

on Thomas' previous life scale of the Minnesota Multiphasic Personality Inventory ("MMPI")

assessment, it was noted that Thomas had a "very high overendorsing of symptoms." (Tr. 1422)

　　　　Dr. Layton reviewed in detail Thomas' medical records. (Tr. 1422-1429)  Dr. Layton

stated that Thomas takes his medication sporadically, but noted that when Thomas is on his

medicine he does significantly better. (Id.)  He opined that Thomas was mildly impaired in

activities of daily living and moderately impaired in maintaining social functioning;

remembering detailed instructions; attention, concentration, persistence, and performing at a

consistent pace; and completing a normal workday or workweek without interruptions from

psychologically based symptoms. (Tr. 1431-1432)  Dr. Layton determined that Thomas would

12

do best with simple, repetitive work with minimum contact with the public, coworkers, and supervisors.  (Tr. 1431)

Counsel for Mr. Thomas then cross examined Dr. Layton and asked if the MMPI to which he previously referred to was completed more than 20 years ago.  (Tr. 1433)  Dr. Layton agreed that the MMPI was completed more than 20 years ago.  (Id.)  Thomas' counsel then asked Dr. Layton to clarify if he was opining that Thomas was capable of sustained activity eight hours a day, five days a week.  (Tr. 1434)  Dr. Layton clarified that it was his opinion that Thomas "doesn't want to and he hasn't and he doesn't have to" but could sustain activity for that period of time.  (Id.)  Dr. Layton also stated that he believed that the structure of a job would help with Thomas' generalized anxiety and panic disorder.  (Tr. 1435)  Dr. Layton testified that his opinion was consistent with Dr. Zeck's 2008 consultative exam, other than his disagreement with Dr. Zeck's assignment of a GAF score of 50.  (Tr. 1437-1438)  He stated that although Dr. Zeck determined that Thomas does not engage in activities of daily living, the record demonstrates otherwise.  (Tr. 1437)

Dr. Layton expressed direct disagreement with the GAF of 50 score assigned by Dr. Zeck.  "I don't agree with the GAF score."  (Tr. 1437)  And he went on to explain that he found Thomas' statements that he didn't engage in the activities of daily living to be accurate: "We know that he does."  (Tr. 1437)  Dr. Layton editorialized on the value of GAF scores given what he considered to be the dichotomy between Dr. Zeck's characterization of Thomas' capabilities and the GAF score he assigned: "I agree with what he said.  That's what I said on my analysis.  But he's giving him a GAF score of 5-0.  And, as I explained, that's why they got rid of GAF scores.  It's not only in that state; it's all the United States.  People would put in a low GAF score with a non-matching mental status.  That's why DSM-V took it out."  (Tr. 1438

13

Thomas' counsel inquired as to what Dr. Layton understood the term moderate to mean. (Tr. 1438)  Dr. Layton testified that moderate meant "occasional difficulty, does not preclude doing the task."  (Id.)  Thomas' counsel then asked if Thomas would have a significant adjustment to a work schedule and work demands.  (Id.)  Dr. Layton opined that Thomas' adjustment would be moderate, not significant.  (Id.)  Dr. Layton stated that significant meant "serious – frequent, one-third to two-thirds."  (Id.)

Next, the ALJ asked Dr. Layton if his opinion varied significantly from Dr. Abraham's opinion. (Tr. 1440)  Dr. Layton stated that Dr. Abraham's determination that Thomas exhibited a marked impairment in his ability to complete a normal workday or workweek without interruptions from psychologically based symptoms was not consistent with the rest of the chart. (Id.)  Dr. Layton explained that Dr. Abraham's opinion was inconsistent with the rest of the chart, which is why Dr. Layton spent additional time at the hearing to testify in detail about the medical records.  (Id.)

Dr. Layton opined that Thomas does not meet or equal any Listing.  (Tr. 1442)  Dr. Layton stated that his functional capacity evaluation was that Thomas could perform simple, repetitive tasks in a non-public or minimal public setting with superficial interaction with coworkers and supervisors.  (Id.)  Dr. Layton clarified that a change of venue or changing from a simple, repetitive routine would take Thomas a little longer due to his low average IQ.  (Id.)

### 3.  Vocational Expert – Ms. Lee[5]

---

[5] Bruce Holderead testified as a VE at Thomas' prior hearing on June 14, 2010.  (Tr. 37-40)  Mr. Holderead testified that a hypothetical individual who was restricted to jobs with only superficial interpersonal contact with coworkers and the public who was limited to simple one to two-step instructions could perform work in significant numbers in the national economy.  (Tr. 38)  Mr. Holderead also testified that the same hypothetical individual could not perform any work with the following marked restrictions:  no useful vocational function; restrictions on getting along with coworkers and supervisors; and restrictions on handling routine changes in a daily work setting. (Id.)

Vocational Expert ("VE"), Ms. Lee, testified at the May 20, 2014, hearing.  (Tr. 1444)
The VE testified as to some of Thomas' past work, however, the ALJ stated that he did not
consider any of the mentioned positions as past relevant work.  (Tr. 1445-1450)  The ALJ then
asked the VE a series of hypothetical questions.

 First, the ALJ asked the VE to assume a  hypothetical individual of Thomas' age, limited
education, work experience, and vocational background who is restricted to performing simple,
repetitive tasks in a non-public setting (not required to interact with the public) setting and who
is limited to occasional superficial interaction with coworkers and supervisors.  (Tr. 1451)  The
VE identified three jobs that such a hypothetical individual could perform:  kitchen helper (5,400
northeast Ohio jobs; 15,800 Ohio jobs; 502,000 national jobs); an industrial cleaner (25,000
northeast Ohio jobs; 78,000 Ohio jobs; 2 million national jobs); and a laundry worker (2,500
northeast Ohio jobs; 8,900 Ohio jobs; 218,000 national jobs).  (Tr. 1452)  Next, the ALJ added
that this individual should not work in close proximity to others, no side-by-side type of work.
(Tr. 1452)  In response, the VE stated that the laundry worker job would no longer be available,
but the kitchen helper job would remain and she changed the industrial cleaner job to a
cleaner/housekeeper (3,000 northeast Ohio jobs; 8,700 Ohio jobs; 278,000 national jobs).  (Tr.
1453-1454)

Thomas' counsel then questioned the VE and added to the first hypothetical that an
individual would be unable to perform activities within a schedule, maintain regular attendance
or be punctual for one third of the time or less.  (Tr. 1457)  The VE stated that employment
would be precluded.  (Id.)  Thomas' counsel then asked the VE to again assume the individual in
the first hypothetical but with the added limitation that such individual would require one extra
break during a two-hour period.  (Id.)  The VE testified that, assuming the attorney was talking

about a 15 minute break every hour, it would be preclusive of employment.  (Id.)  Also referring

to the first hypothetical, counsel asked the VE to consider an individual who is working in the

same presence of other people and would occasionally accuse another person of inappropriate

behavior.  (Tr. 1458)  The VE stated that employment would also be precluded with that

limitation.  (Tr. 1458)   Referring again to the first hypothetical, counsel suggested an additional

limitation that this individual would occasionally be off task because of his inability to focus on

the activity before him.  The VE stated if an individual was off task one-third of that time that

would preclude the individual from maintaining employment.  (Tr. 1458)

Next, the ALJ referred to his first hypothetical again but added that there was to be

infrequent changes in duties.  (Tr. 1459)  The VE stated that assembly jobs in general have the

least change.  (Tr. 1460)  Counsel for Thomas stated that assembly workers generally work in

close proximity to one another.   (Tr. 1461)  In response, the VE stated she would rule out

assembly work based on the close proximity limitation.  (Tr. 1461)

## IV.    Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the

existence of a disability. "Disability" is defined as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which

can be expected to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months." 42 U.S.C. § 423(d)(1)(a). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or
> mental impairment or impairments are of such severity that he is not only unable to
> do his previous work but cannot, considering his age, education, and work

experience, engage in any other kind of substantial gainful work which exists in the national economy[6]....

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[13] claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.R.F. §§ 404.1520, 416.920; *Bowen v. Yuckert,* 482 U.S. 137, 140-142 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.* 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to produce evidence that establishes whether the claimant has the RFC and vocational factors to perform work available in the national economy. *Id.*

---

[6] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423 (d)(2)(A).

**V.    The ALJ's Decision**

The ALJ issued a decision on January 26, 2015.  A summary of his findings is as follows:

1.  Thomas had not engaged in substantial gainful activity since December 14, 2007, the date of his application.[7]  (Tr. 1373)

2.  Thomas has the following severe impairments: major depressive disorder with psychosis, schizoaffective disorder, panic disorder without agoraphobia, generalized anxiety disorder, and antisocial and narcissistic personality disorder.  (Tr. 1373)

3.  Thomas does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments.  (Tr. 1374)

4.  Thomas has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations:  claimant is limited to simple, repetitive tasks in a non-public setting where he is not required to interact with the public, he is limited to superficial and occasional interaction with coworkers and supervisors, and he cannot work in close proximity with others, meaning no side by side work.  (Tr. 1376-1377)

5.  Thomas has no past relevant work.  (Tr. 1379)

6.  Thomas was born on August 24, 1961, and was 46 years old, which is defined as a younger individual age 18-49 on the date his application was filed.  (Tr. 1379)

7.  Thomas has a limited education and is able to communicate in English.  (Tr. 1380)

8.  Transferability of job skills is not an issue because the claimant does not have past relevant work.  (Tr. 1380)

9.  Considering Thomas' age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that he can perform.  (Tr. 1380)

Based on these findings, the ALJ determined that Thomas has not been under a disability

---

[7] The ALJ states that Thomas application was dated December 14, 2007, yet there is no evidence of this in the record.  Thomas 2007 application was dated December 27, 2007, with a disability onset date of November 1, 2006.  (Tr. 61)  Thomas 2012 application was filed on August 13, 2012, with a disability onset date of August 26, 2010.  (Tr. 1657, 1661)

through the date the application was filed.  (Tr. 1381)

## VI.    Parties' Arguments

Thomas filed his merit brief in this matter on March 29, 2016.  (Doc. 13)  He presented

two legal issues for review:

Issue I:  The ALJ committed legal error when he failed to properly evaluate the medical evidence of record and as such his decision was not supported by substantial evidence.

Issue II:  The residual functional capacity ("RFC") is not supported by substantial evidence and does not accurately portray Mr. Thomas' functional limitations.

Defendant filed her brief on May 31, 2016, asserting that the ALJ gave good reasons for

discounting the opinion of Thomas' treating physician, Dr. Abraham, and that the RFC

accurately portrayed Thomas' limitations.  ECF Doc. No. 15, Page ID# 2220-2228.

## VII.   Law & Analysis

### A.    Standard of Review

This court's review is limited to determining whether there is substantial evidence in the

record to support the ALJ's findings of fact and whether the correct legal standards were applied.

*See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed

if the administrative law judge's findings and inferences are reasonably drawn from the record or

supported by substantial evidence, even if that evidence could support a contrary decision.");

*Kinsella v. Schweiker,* 708 F.2d  1058, 1059 (6th Cir. 1983).  Substantial evidence has been

defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v.

Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and*

*Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).

The Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §§ 405(g) and 1383(c)(3). The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter,* 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen,* 800 F.2d 535,545 (6th Cir. 1986); *see also Her v. Comm'r of Soc. Sec.,* 203 F.3d 288, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached." *See Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen,* 800 F.2d at 545 (*citing Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See e.g. White v. Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v.*

20

*Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue,* No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).

**B.      The ALJ properly weighed the opinion of Thomas' treating psychiatrist**

Thomas argues that the ALJ erred in reviewing the July 27, 2009, opinion of his treating psychiatrist, Dr. Abraham.  ECF Doc. No. 13, Page ID# 2186-2193.  Thomas contends that the ALJ never considered if the treating source's opinion should receiving controlling weight – *i.e.*, whether it was well-supported by clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the administrative record.  Id. at 2188.  Thomas further asserts that Dr. Abraham's opinion that Thomas has marked restrictions in his ability to complete a normal workday or workweek should have been given controlling weight.  Id. at 2189.

**1.   Treating Physician Rule**

Social Security Administration regulations set forth how medical opinions are to be weighed.  20 C.F.R. § 404.1527(c).  In general, the regulations require that an opinion from a medical source who has examined a claimant is given more weight than from a source who has not performed an examination, and an opinion from a medical source who regularly treats the claimant is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship.  *id.* § 404.1502, 404.1527(c)(1)&(2).  *Gayheart*

*v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013). In other words, "[t]he regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker." *Id. citing* Social Security Rule No. 96–6p, 1996 WL 374180, at *2 (July 2, 1996).

If treating source opinions are (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "not inconsistent with the other substantial evidence in [the] case record," then they must receive "controlling" weight. 20 C.F.R. §404.1527(d)(2); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 286 (6th Cir. 2009). If the treating source opinion is not given controlling weight, then the ALJ must apply several factors in determining the weight to give the opinion including: the length, frequency, nature, and extent of the treatment relationship; supportability; consistency; specialization; and other factors which support or contradict the opinion. 20 C.F.R. § 404.1527(c)(2). These reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Gayheart,* 710 F.3d at 376 (quoting SSR 96–2p, 1996 WL 374188 at *5 (SSA)). These requirements are referred to as the treating physician rule.

"The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 544–45 (6th Cir. 2004) (citing *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999)) (internal quotations omitted). Because the reason-giving requirement exists to "ensur[e] that each denied claimant receives fair process," the Sixth Circuit

22

has held that an ALJ's "failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight" given "*denotes a lack of substantial evidence,* even where the conclusion of the ALJ may be justified based upon the record." *Id.* (quoting *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 243 (6th Cir.2007) (emphasis added)).  However, although the regulations instruct an ALJ to consider various factors, they expressly require only that the ALJ's decision include "good reasons ... for the weight ... give[n] [to the] treating source's opinion"—not an exhaustive factor-by-factor analysis. *Francis v. Comm'r Soc. Sec. Admin.*, 414 F. App'x 802, 804 (6th Cir. 2011) (quoting 20 C.F.R. § 404.1527(d)(2).

## 2.  Dr. Abraham's Opinions

Treatment records indicate that Thomas treated with psychiatrist Dr. Abraham from 2008 through 2009.  On July 27, 2009, Dr. Abraham completed a mental functional capacity assessment ("MFCA") on behalf of Thomas.  (Tr. 1268-1269, 1897)  Notably, Dr. Abraham determined that Thomas was markedly impaired in two areas:  (1) his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistence pace without an unreasonable number length of rest periods and (2) his ability to travel in unfamiliar places or use public transportation.  (Id.)  Dr. Abraham assigned Thomas a GAF score of 50[8] and opined he would be unemployable.  (Tr. 1269)  Dr. Abraham

---

[8] GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses. See American Psychiatric Association: Diagnostic & Statistical Manual of Mental Health Disorders, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34. GAF 41–50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Kornecky v. Comm'r of Soc. Sec.,* 167 F. App'x 496, 503 (6th Cir. 2006) (quoting DSM-IV-TR at 34)).  A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id.  See* discussion of Dr. Layton's views on the value of GAF scores, pp. 13-14 *supra*.

23

further noted that Thomas' felony history prevents employment.  Id.

The ALJ determined that Dr. Abraham's opinion was entitled to "less weight" and

provided the following explanation:

> [I]t is a check box form, which is conclusory, and Dr. Abraham did not provide
> supporting documentation.  He also assigned the claimant a GAF of 50, which indicates
> serious symptoms but the overall evidence in the record, including the testimony of the
> medical expert, Dr. Layton establishes that the claimant is only moderately limited.
> Moreover, Dr. Abraham stated that the claimant's felony prevented employment but this
> is not a factor that is considered by the Social Security Administration when determining
> disability.  Furthermore, he concluded that the claimant was unemployable but this is a
> determination reserved for the Commissioner of Social Security (Exhibits 18F, 26F).

(Tr. 1379).  The Commissioner argues that the ALJ "implicitly rejected" giving Dr. Abraham's

opinion controlling weight by deciding that it was only entitled to lesser weight. ECF Doc. No.

15, Page ID# 2217, 2221-2226.  The Commissioner also asserts that the ALJ provided several

"good reasons" for giving less weight to Dr. Abraham's opinion including:  (1) the fact the

opinion was a check-box form without further support, (2) the ALJ's finding that the GAF score

assigned by Dr. Abraham's was inconsistent with other evidence in the record including Dr.

Layton's testimony; and (3) the ALJ's finding that Dr. Abraham inappropriately considered other

facts when determining Thomas' inability to work.  Id. at Page ID #2223-2226.

Thomas contends that the ALJ violated the treating physician rule in two ways.  First, by

not considering whether the opinion should receive controlling weight – i.e., whether it was well-

supported by clinical and laboratory diagnostic techniques and not inconsistent with other

substantial evidence in the record.  ECF Doc. No. 13, Page ID# 2188.  Second, Thomas asserts

that the ALJ erred by not giving controlling weight to Dr. Abraham's opinion of marked

functional limitations in Thomas ability to complete a normal workday and workweek  without

interruption from psychologically based symptoms and to perform at a consistent pace without

an unreasonable number and length of rest periods.  Id., Page ID# 2189-93.

Under 20 C.F.R. § 416.927(d)(2), a treating physician's opinion is entitled to controlling weight only if it "is not inconsistent with the other substantial evidence in [the] case record."  In the present case, the ALJ explained that Dr. Abraham's assignment of a GAF score of 50, indicative of serious symptoms, was inconsistent with "the overall evidence in the record, including the testimony of medical expert Layton, [which] establishes that the claimant is only moderately limited."  (Tr. 1379)

As to the issue of inconsistency, the ALJ focused only on the GAF score assigned by Dr. Abraham.  The ALJ stated that the majority of the evidence is inconsistent with Dr. Abraham's assignment of a GAF score of 50.  As to GAF scores, however, the record itself is not consistent. There are four other GAF scores in the record.  Consultative examiner Dr. Zeck assigned three different GAF scores:  59 (in 2003); 50 (in 2008); and 51 (in 2012) and Nord Center counselors Ms. Smart & Ms. Hyde[9] assigned a GAF score of 60 in 2013.  Only Dr. Zeck's 2008 GAF score was consistent with the GAF assigned by Dr. Abraham.  The ALJ discounted that GAF score because the ALJ found it was internally inconsistent with Dr. Zeck's report which found only moderate limitations in all work related abilities.  In addition, Dr. Zeck assigned two other GAF scores (51 and 59) indicating only moderate symptoms. Although Dr. Layton did not assign a GAF score, as discussed more fully above, he testified that he disagreed with Dr. Abraham's assignment of a GAF of 50 finding that it was too severe and inconsistent with Thomas' actual capabilities.  (Tr. 1437)  Thus, Dr. Abraham's GAF score of 50 was found to be inconsistent

---

[9] The ALJ properly determined that Ms. Hyde and Ms. Smart are not considered "acceptable" medical sources per 20 C.F.R. 416.913. Evidence from "acceptable" medical sources is used to establish whether a medically determinable impairment exists.  20 CFR 416.913(a).  However, evidence from non-medical sources may be used to show the severity of a claimant's impairment.  20 CFR 416.913(d)(1).

with the majority of the other GAF scores, including those assigned by the treatment providers and analysts who provided care or findings regarding Thomas nearer in time to his current application for Social Security benefits.

However, the ALJ did not limit his comparison of the Abraham GAF score to other GAF scores.  Rather the ALJ stated that the GAF score "indicating serious symptoms" was inconsistent with the "overall evidence in the record, including the testimony of the medical expert, Dr. Layton [which establishes] that the claimant is only moderately limited."  (Tr. 1379) Dr. Layton did, indeed, testify that Thomas was at most moderately limited in all functional areas.  (Tr. 1431-1432)  As the ALJ pointed out, opinions by the state agency reviewers Dr. Semmelman (1259-60), Dr. Umana (1524), and Dr. Lewin (1508) and Nord counselors, Ms. Smart and Ms. Hyde (Tr. 2039), also concluded that Thomas had no more than moderate limitations.

A bit more troublesome are the determinations by Dr. Zeck with regard to Thomas' ability to withstand the stress and pressures of day-to-day work.  In 2008, Dr. Zeck opined that Thomas was moderately limited in most work-related domains.  (Tr. 1244)  However, Dr. Zeck noted that Thomas was "*at least* moderately impaired" in his ability to withstand the stress and pressures of day-to-day work.  (Tr. 1244)(emphasis added)  In 2012, when reviewing this same category, he stated that Thomas "would have difficulty responding appropriately to work pressures in a work setting.  This is based upon his mistrust of others as he reports."  (Tr. 2112) In 2003, he similarly stated that Thomas "would have a difficult time withstanding the stress and pressures associated with day-to-day work activity due to focusing problems and intellectual as well as emotional problems.  (Tr. 1168)

As to Dr. Zeck's 2003 and 2012 opinions he does not make clear what severity of

26

"difficulty" (e.g. moderate, marked, etc…) Thomas might have in these areas.   However, Dr. Zeck assigned GAF scores indicating only moderate difficulty in those same opinions (59 in 2003; 51 in 2012).   Therefore, the majority of Dr. Zeck's opinions, including those expresses closest in time to Thomas' current Social Security benefits application, do not clearly support greater than moderate limitations.

In addition to medical opinions, the ALJ determined that Thomas' subjective complaints were not entirely credible.  (Tr. 1377)  The ALJ pointed to an example of an inconsistency in Thomas' testimony for support and Dr. Layton's opinion that Thomas exaggerates due to his personality disorder.  (Tr. 1377-78)  The ALJ also notes that Thomas is not always compliant with his medication and does not take his medication as prescribed.  (Tr. 1378)  The ALJ stated that he gave credit to Dr. Layton's review of the medical records, in which Dr. Layton determined that the medical records show that Thomas' depression is situational and he does better on medication.  (Tr. 1378).

Based on all of the above, substantial evidence supports the ALJ's implicit determination that controlling weight should not be assigned to the opinions of treating physician Dr. Abraham, and that the overall evidence in the record is inconsistent with Dr. Abraham's finding of greater than moderate limitations.   The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter,* 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen,* 800 F.2d 535,545 (6th Cir. 1986); *see also Her v. Comm'r of Soc. Sec.,* 203 F.3d 288, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  *See Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997).

27

Thomas also quotes *Gayheart* for the proposition that "conflicting substantial evidence" should consist of more than the opinions of "non-treating and non-examining" sources.  ECF Doc. No. 13, Page ID# 2192.  However, *Gayheart* is distinguishable.  First, the conflicting substantial evidence here consists of both "non-treating and non-examining" sources, *as well as* treating and examining sources.  Although Dr. Layton and the state agency reviewers did not treat or examine Thomas, Dr. Zeck was an examining source and Ms. Smart had a treating relationship with the claimant from 2013 through 2014.  Both sources identified no more than moderate limitations for Thomas' work-related abilities.  Ms. Smart's opinion is unquestionably relevant to this part of the analysis, regardless of her status as a therapist, because, in *Gayheart*, the Sixth Circuit determined that evidence from a treating therapist should be considered by an ALJ in the analysis of the consistency of a treating physician's opinion with the record as a whole.  *Id.*, 710 F.3d at 379.

In addition, Thomas argues that the ALJ applied more scrutiny to the opinion of the treating physician than to the opinion of the consultative doctors in violation of *Gayheart*.  Thomas contends that the ALJ used a double standard when he ignored the fact that Dr. Semmelman also completed a checkbox form, stating "the ALJ failed to explain why one [checkbox form] was acceptable and the other was not."  ECF Doc. No. 13, Page ID# 2189.  However, Thomas' characterization of Dr. Semmelman's assessment is inaccurate.  Dr. Semmelman did complete a "checkbox form" (Tr. 1259-1260) but also attached to her form a thorough functional capacity assessment in which she reviewed the record evidence and came to conclusions about the work that Thomas could perform.  (Tr. 1261)  Thus, Thomas' argument that the ALJ used a double standard when comparing the opinions of Dr. Abraham and Dr. Semmelman is without merit.  Unlike *Gayheart*, the ALJ here did not apply greater scrutiny to

the opinion of the treating physician.

In addition to his determination that Dr. Abraham's opinion was not entitled to controlling weight, because it was not consistent with other substantial evidence, the ALJ also provided "good reasons" for assigning the opinion less weight.  The ALJ found that Dr. Abraham's opinion was conclusory and not supported by the evidence and that some of Dr. Abraham's determinations were on issues reserved for the Commissioner.  The inconsistency of a treating source's opinion with the record as a whole is also a factor that the ALJ considered as discussed more fully above.

As to supportability, the regulations provide:

> The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion

20 C.F.R. § 404.1527.  In this case, the ALJ discounted Dr. Abraham's opinion because it was conclusory (a checkbox form without explanation) and did not provide any supporting documentation.  (Tr. 1379); *White v. Comm'r of Soc. Sec.,* 572 F.3d 272, 286 (6th Cir. 2009) ("conclusory statements from physicians are properly discounted by ALJs"); *Buxton v. Halter,* 246 F.3d 762, 773 (6th Cir.2001) (stating that ALJs are "not bound by conclusory statements of doctors")).  The Sixth Circuit recently explained that "[w]hile checklist opinions are not *per se* unreliable…it is not improper for an ALJ to take into consideration the format of a medical opinion, especially in light of other factors in the record that signal unreliability." *Kepke v. Comm'r of Soc. Sec.,* 636 F. App'x 625, 630 (6th Cir. 2016).  Dr. Abraham's checklist opinion did not provide an explanation for his findings; therefore, it was proper for the ALJ to take this into consideration in discounting Dr. Abraham's opinion, particularly where Dr. Abraham's

opinion that Thomas was more than moderately limited was inconsistent with other substantial evidence in the record.

The ALJ also properly concluded that he was not required to give any weight to Dr. Abraham's opinion that Thomas was unemployable. A medical source's statement on an issue reserved for the Commissioner, such as an assertion that a claimant is "disabled" or "unable to work," is a legal conclusion, not a medical opinion, and such statements are not entitled to any special significance. 20 C.F.R. § 416.927(e); *Warner v. Comm'r of Soc. Sec.,* 375 F.3d 387, 390 (6th Cir. 2004). The ALJ further noted that Dr. Abraham's opinion provides that Thomas' "felony prevents employment." The ALJ properly states that Thomas' felony record is not a proper factor to be considered in a disability determination under the social security regulations.

As discussed more fully above, the ALJ also found that Dr. Abraham's opinion was not consistent with the record as a whole. The ALJ gave more weight to several other medical opinions that he found were most consistent with the medical records. Great weight was given to the opinions by Dr. Layton, Dr. Semmelman, and Dr. Umana who determined that Thomas exhibited only moderate limitations in his work-related abilities. (Tr. 1378) The ALJ also gave some weight to the opinions of Dr. Lewin, Dr. Zeck, and counselors Smart & Hyde, which found that Thomas was no more than moderately limited. (Tr. 1378-79) The ALJ further determined that Thomas' complaints concerning the intensity, persistence, and limiting effects of his mental health symptoms were not entirely credible. (Tr. 1377) The ALJ noted inconsistent statements made by Thomas and pointed to Dr. Layton's testimony that Thomas tends to exaggerate due to his personality disorder. (Tr. 1377-78) The ALJ discussed Thomas' Nord Center treatment notes and all of the opinions of medical experts and determined that the overall evidence in the record is more consistent with only moderate limitations in Thomas' functioning. (Tr. 1375-79)

30

Based on all of the above, the ALJ properly weighed the opinion of Dr. Abraham, including the ALJ's implicit decision not to assign controlling weight to the opinion, and provided "good reasons" for assigning less weight to Dr. Abraham's opinion.

### C.      The RFC accurately portrays Thomas' limitations

Thomas next argues that the RFC did not accurately portray Thomas' limitations. Specifically, Thomas asserts that the ALJ should have included the following limitations in the RFC:  (1) Thomas' inability to complete a normal workday or workweek; (2) his need for extra time to learn new or changed tasks; and (3) his inability to handle jobs that were fact paced or of high demand.  ECF Doc. No. 13, Page ID# 2196-97.  Thomas further contends that there was no medical evidence to support the ALJ's conclusion that Thomas would be able to get along with people and act appropriately on a sustained basis as long as he was not required to work "side-by-side."  Id., Page ID #2197.

### 1.  RFC Standard

If an ALJ determines either that a claimant does not have the residual functional capacity to perform past relevant work, or as in this case, the claimant has no past relevant work, the ALJ must show that the claimant has the capacity to perform other substantial gainful activity that exists in the national economy. *See Kirk v. Secretary of Health and Human Services,* 667 F.2d 524, 529 (6th Cir.1981), *cert. denied,* 461 U.S. 957, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983). To meet this burden, there must be "a finding supported by substantial evidence that [plaintiff] has the vocational qualifications to perform specific jobs." *O'Banner v. Secretary of Health, Education & Welfare,* 587 F.2d 321, 323 (6th Cir.1978).  Substantial evidence may be produced through reliance on the testimony of a vocational expert in response to a "hypothetical" question, but only if the question accurately portrays the claimants individual physical and mental

31

impairments." *Davis v. Sec'y of Health & Human Servs.,* 915 F.2d 186, 189 (6th Cir.1990);

*Parley v. Sec'y of Health & Human Servs.,* 820 F.2d 777, 779 (6th Cir.1987). However, it is also

"well established that an ALJ ... is required to incorporate only those limitations accepted as

credible by the finder of fact" into the hypothetical question. *See Parks v. Social Sec. Admin.*,

413 Fed. App'x. 856, 865 (6th Cir.2011); *Casey v. Sec'y of Health & Human Servs. .,* 987 F.2d

1230, 1235 (6th Cir.1993).

### 2.  Inability to complete a normal workday or workweek

Thomas first contends that the ALJ should have incorporated a limitation that he could

not complete a normal workday or workweek based on Dr. Abraham's opinion that Thomas was

markedly impaired in this respect.  "[T]he ALJ is charged with evaluating several factors in

determining the RFC, including the medical evidence (not limited to medical opinion testimony),

and the claimant's testimony." *Henderson v. Comm'r of Soc. Sec.,* No. 1:08cv2080, 2010 WL

750222, at *2 (N.D.Ohio Mar.2, 2010).  There is no requirement that the ALJ's RFC finding be

based on the medical opinion of a physician. See 20 C.F.R. § 404.1545(a) (3).  Thus, an ALJ

"does not improperly assume the role of a medical expert by assessing the medical and non-

medical evidence" when determining the claimant's RFC. *See Poe v. Comm'r of Soc. Sec.*, 342 F.

App'x 149, 157 (6th Cir.2009).

Here, the ALJ found that Thomas' symptoms were not entirely credible.  (Tr. 1377)

"Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions

among the medical reports, claimant's testimony, and other evidence." *Walters v. Comm'r of Soc.*

*Sec.,* 127 F.3d 525, 531 (6th Cir.1997) (citing *Bradley v. Sec'y of Health & Human Servs.,* 862

F.2d 1224, 1227 (6th Cir.1988)).  Moreover, as discussed in the prior section, the ALJ

discounted Dr. Abraham's opinion that Thomas suffered from anything more than moderate

symptom and, thus, did not find credible the opinion that Thomas was markedly impaired in his ability to complete a normal workday or workweek.  Per the undersigned's discussion above, the ALJ's decision was supported by substantial evidence in the record including virtually all the other medical opinions that addressed the issue.  Because the ALJ is not required to include limitations he does not find to be credible, he did not err in omitting this limitation.

Thomas also argues that several other medical opinions (including ones from Dr. Layton and the state agency reviewing physicians) reflect at least moderate impairment in his ability to complete a normal workday or workweek and, thus, this limitation should have been accounted for in the RFC.  However, Courts have recognized that summary conclusions in the Mental RFC assessments are merely preliminary findings used to "aid in deciding the presence and degree of functional limitations and the adequacy of documentation and does not constitute the [actual] RFC assessment." See *Hahn v. Astrue,* No. 5:10-CV-00279, 2011 WL 1136231, at *6 (N.D. Ohio Mar. 29, 2011) (quoting *Yurek v. Comm'r Soc. Security,* 2009 U.S. Dist. Lexis 78922, *18–19 (E.D.N.C.2009).  The record reveals that in spite of Thomas' moderate limitations, none of these sources found that Thomas was incapable of sustaining day to day work in their ultimate RFC assessment.  *Id.*  (finding that when an ALJ adopted the state agency reviewers RFC determination, exclusion of plaintiff's moderate limitation of being able to complete a normal workday and workweek without interruptions from psychologically based symptoms, was not an error) See also *Atkinson v. Comm'r Soc. Sec*., 2010 U.S.App. Lexis 15691, *8 (10th Cir.2010). Based on all of the above, Thomas' argument is not well-founded.

### 3.  Extra time to learn new or changed tasks

Thomas next argues that the ALJ should have included a limitation in the RFC that he needs extra time to learn new or changed tasks as described by Dr. Layton (citing Tr. 1431 & 1432).  However, Thomas is selectively quoting Dr. Layton's testimony in making this argument.  Dr. Layton stated that it will take Thomas a little longer to learn and that it would not be good to change venue, but concluded that this problem would result in only moderate limitations and that Thomas could complete simple, repetitive tasks in a non-public or minimal public setting which includes superficial interaction with coworkers and supervisors.  (Tr. 1432, 1442)  He stated that Thomas' ability to respond to changes would be "low average" or at the "lower speed of normal" but still average or normal and stated that no additional limitations were necessary in the RFC.  (Tr. 1443)

### 4.  Inability to fast paced or high demand jobs

Thomas also contends that the ALJ failed to include in the RFC a limitation that he could not handle fast paced or high demand jobs as noted in Dr. Semmelman's RFC determination (Tr. 1306).   ECF Doc. No. 13, Page ID# 2196.   The ALJ acknowledged Dr. Semmelman's determination but found Dr. Layton's opinion that Plaintiff could perform simple, repetitive tasks more persuasive.  (Tr. 1378)  While an ALJ is not required to incorporate all evidence into the RFC, an ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." SSR No. 96-8p, 1996 SSR LEXIS 5, * 19.  Here, the ALJ did that.  He explained that Dr. Layton, a medical expert, was able to review the entire file and found Thomas' depression was more situational and he does better on medication and, thus, is able to perform simple, repetitive tasks that involve minimal contact with the public.  (Tr. 1378)

34

### 5.  No side-by-side work

Finally, Thomas asserts that there was no evidence in the record to support the ALJ's conclusion that Thomas would be able to get along with people and act appropriately on a sustained basis as long as he was not required to work "side-by-side."  ECF Doc. No. 13, Page ID# 2197.  The Commissioner counters that "[a]lthough no medical opinion suggested that [Thomas] could not do side-by-side work, such a limitation is consistent with Dr. Layton's finding concerning [Thomas'] difficulty working with others."  ECF Doc. No. 15, Page ID# 2228.  The Commissioner is correct.  Dr. Layton specifically stated that Thomas should have minimum contact with public, supervisors, and coworkers, which is consistent with no side-by-side work.  (Tr. 1431)  Moreover, even if the inclusion of this additional limitation were error, the additional limitation accounted for a more restrictive RFC (not less restrictive) which would have made it more likely that Thomas could have been found disabled (not less likely) and would be harmless because the VE testified that substantial gainful employment existed with or without this additional limitation to the RFC.   The ALJ asked the VE if there would be jobs for an individual with Thomas' same age, education, and vocational background who was limited to performing simple, repetitive tasks in a nonpublic setting with superficial interaction with coworkers and supervisors.  (Tr. 1451)  The VE testified that substantial gainful employment existed for such individual.  (Tr. 1451-52)  When the ALJ added the no side-by-side work limitation in a later question, the VE still found substantial gainful employment existed for such individual.  (Tr. 1453-54)  Based on all of the above, the addition of a limitation that Thomas could not complete side by side work was not a reversible error.  This limitation was consistent with Dr. Layton's testimony that Thomas had difficulty working with others.  Further, even if such limitation was added in error, it was harmless because it would not have changed the

determination that substantial gainful employment existed for such an individual.[10]

## VIII.    Conclusion

In summary, the ALJ's decision to assign less weight, rather than controlling weight, to Dr. Abraham's opinion was supported by substantial evidence and the ALJ provided "good reasons" for the weight assigned.  Further, the RFC accurately portrayed Thomas' limitations.  Thus, Thomas has not demonstrated a basis upon which to reverse or remand the Commissioner's decision.  For these reasons, I recommend that the final decision of the Commissioner be AFFIRMED, pursuant to 42 U.S.C. § 405(g).


Dated: November 10, 2016

Thomas M. Parker
United States Magistrate Judge


**OBJECTIONS**

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).  See also *Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).**

---

[10] Thomas also contends that the evidence showed that Thomas has problems being around people and being in the same vicinity was frequently enough to set off his anxiety and panic attacks or to be aggressive and act "weird" – implying that he could not complete side-by-side work.  However, the Sixth Circuit has held that an "ALJ is not obligated to incorporate unsubstantiated complaints into his hypotheticals." *Stanley v. Sec'y of Health & Human Servs.,* 39 F.3d 115, 118–19 (6th Cir.1994) (citing *Hardaway v. Sec'y of Health & Human Servs.,* 823 F.2d 922, 927–28 (6th Cir.1987)); *see also Harrod v. Colvin,* No. 1:14CV805, 2015 WL 106102, at *18 (N.D. Ohio Jan. 7, 2015) (finding the ALJ was not obligated to incorporate into the RFC Plaintiff's unsubstantiated complaints.)